UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

NATALIE GRAINGER,                     :
                                      :      Case No.: 7:23-cv-01802 (CS)
                    Plaintiff,        :
                                      :
         v.                           :      **AMENDED COMPLAINT**
                                      :
WESTCHESTER COUNTRY CLUB, INC.,       :
MARK CHRISTIANA and TOM NEVIN,        :      **Jury Trial Demanded**
                                      :
                                      :
                    Defendants.       :
-----------------------------------------------------------X

Plaintiff Natalie Grainger (Plaintiff or "Grainger"), by and through her attorneys, Wigdor

LLP, as and for her Complaint against Defendant Westchester Country Club ("WCC" or the

"Club"), Mark Christiana ("Christiana") and Tom Nevin ("Nevin") (collectively "Defendants"),

alleges as follows:

## PRELIMINARY STATEMENT

1.      WCC, an exclusive country club in Westchester, New York, claims to be a

"family oriented" establishment.  In 2018, Grainger, a world-class squash athlete, joined WCC as

its Squash Director.  She was the only female Director at the time and, upon information and

belief, the only female sports Director in the Club's 100-year history.  She was very successful in

her role.

2.      Over time, however, Grainger became concerned that female Club employees

were being harassed by male Club members.  For example, she learned that two of her junior

reports were involved in sexual relationships with male club members, including Member 1.  In

one instance, Grainger had to intervene because one of these women had, according to the

woman's sister, been drugged while out with a male club member.  In another instance, Grainger

1

saw that a female employee was included in a "sext" exchange among male club members, including Member 1, discussing a "lineup" of women they had apparently picked out for the evening's "fun."

3.      Grainger complained about the harassment.  She protested repeatedly to the Club's Head of Racquets and a Member of the Club's Board, Board Member 1, identifying the members involved.  She also submitted a written complaint to the Club's Board Chairman, on March 7, 2022.

4.      The Club responded by demanding that Grainger "resign" or else, according to Club Manager Nevin, she would be fired for cause and publicly embarrassed.

5.      Grainger refused, complaining that she was the victim of retaliation.  Defendants fired her the next day.

6.      Grainger brings this action alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL") and the New York Not-for-Profit Corporations Law § 715-b ("Not-for-Profit Law").  She also alleges breach of contract.

## ADMINISTRATIVE PROCEDURES

1.      On January 13, 2023, Grainger filed a Charge of Discrimination (the "Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"). The EEOC issued Plaintiff a Notice of Right to Sue on September 22, 2023.[1]

---

[1]      On June 28, 2023, during an Initial Conference, the Court granted Plaintiff leave to amend the Complaint to add claims of discrimination and retaliation under Title VII.

**JURISDICTION AND VENUE**

7.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is a diversity of citizenship among the parties and this action involves an amount in controversy that exceeds $75,000, excluding interests and costs.

8.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred here.  The Club has business operations located in this District and Plaintiff's employment and performance occurred in this District.

**PARTIES**

9.     Plaintiff Natalie Grainger is the former Director of Squash at WCC.  Grainger was an employee of WCC.  She is domiciled in Connecticut.

10.    Defendant WCC is a private country club located in Rye, New York.  It is a New York registered not-for-profit corporation.

11.    Defendant Mark Christiana was Board President of WCC.  He is domiciled in New York.

12.    Defendant Tom Nevin was Club Manager of WCC.  He is domiciled in South Carolina.

**FACTS**

**I.     BACKGROUND**

13.    WCC promotes itself as "an exclusive family oriented Club" in Westchester that "has been ranked 29th of 4,000 private Clubs in the United States[2] and maintains its status as a

---

[2]     https://www.wccclub.org/about-us.

'Platinum Club.'"[3]  The Club offers its members "world-class facilities, including two Championship Golf Courses, a Beach Club on Long Island Sound and comprehensive Tennis and Squash facilities."[4]  To be admitted, a member has to pay a $170,000 initiation fee and $15,000 in annual fees.

14.     For the last 25 years, Grainger has been one of the top female squash players and coaches in the world.

15.     She is one of the most decorated professional squash players in United States history and is the only player (man or woman) to achieve the #1 world ranking in both singles and doubles squash.

16.     Among her many extraordinary achievements, Grainger is a three-time U.S. Open Champion, 15-time U.S. National Champion, seven-time South African National Champion, three-time Pan American Games gold-medal winner for the United States, and a World Open Champion in Women's Doubles and Mixed Doubles.  Grainger is also a two-time World 35+ and a World 40+ Squash Singles Champion.

17.     Grainger's coaching achievements are equally extraordinary.  She coached the U.S. National Team for 15 years and the U.S. Women's World Championship Team.  In 2011, the U.S. Olympic Committee named her Coach of the Year.  She coached all four of the top ranked U.S. female players currently listed in the World Rankings.

18.     Grainger has earned numerous awards for her leadership in women's sports.  She served for eight years as the President of the Women's International Squash Professional Association, the sport's professional governing body, and in 2016 was awarded the U.S. Squash

---

[3]     "Platinum" status is "the most revered recognition in the private cub industry."
https://www.platinumclubsofamerica.com/.
[4]     https://www.wccclub.org/about-us.

Achievement Cup — the sport's most prestigious award given for "Profound Contributions" to squash. Grainger also received the inaugural "Tournament of Champions Women's Leadership Award" in 2014.

19.     From 2009 to 2020, Grainger also served as a Board Member of Squash Haven, an inner-city enrichment program that helps at-risk youth.

20.     In 2011, after retiring from professional competition, Grainger became the Director of Squash at Chelsea Piers in Connecticut, where she built the program, managing six staff members and nine teaching professionals. In 2011, when Grainger started, there was no squash program; when she departed in 2017, Chelsea Piers had over 500 squash members.

## II.     WCC HIRES GRAINGER

21.     In 2018, WCC hired Grainger from among approximately 70 candidates as the Club's Director of Squash, replacing the outgoing male Director, Lee Witham ("Witham").[5]

22.     Grainger's overall responsibilities required her to manage all aspects of the Club's Squash Program, including managing all level of instruction, junior programs, tournaments, scheduling, budgeting, and full oversight of the squash facilities and the Retail Squash Shop. Grainger was also responsible for managing a staff of squash professionals.

23.     Grainger's compensation consisted of multiple components. She earned an annual base salary of $145,000. She also earned additional compensation from lessons, clinics, camps, tournaments and professional merchandise.

24.     Grainger was incredibly successful in her role. She created, expanded and improved WCC's squash programs for all ages, including pro-am doubles, club championships

---

[5]     For years, WCC permitted Witham to run his own LED court lighting business from the Club.

for juniors, doubles club championships for adults, parent-child doubles, and a new Rackelton

Championship, which combined competitions in squash, tennis and table tennis into one event

for juniors.

25.     As a result of her connections to top college coaches, Grainger developed a

special mentoring program to assist youth player members in getting accepted to top colleges, as

encouraged by many members including Board Member 1.

26.     Grainger also, with Board urging and approval, created and launched the Club's

groundbreaking Pickleball program on the Club's paddle tennis courts, the first of its kind in the

United States.

27.     Because of the program's resounding success, in 2021, Grainger became Co-

Director of Pickleball, entitling her to 50% of all annual Pickleball revenues moving forward.

28.     In less than two years prior to the pandemic, Grainger expanded the Club's squash

programming by more than 400 percent.

29.     She was rewarded for her achievements both in the form of merit raises and by

the Club increasing her responsibilities.

30.     Tellingly, Grainger was the only female Director of any sport at WCC.[6]

## III.     GRAINGER BECOMES A WHISTLEBLOWER AND COMPLAINS ABOUT SEXUAL HARASSMENT

31.     Grainger was able to achieve these stellar results despite a work environment that

was often hostile to women.  In particular, over time, Grainger came to believe that the Club

created, fostered and enabled a sexually hostile work environment for women.

---

[6]     Relatedly, at the time Grainger was hired and throughout virtually her entire employment, there were no female Board Members. Upon information and belief, WCC installed a female Board Member for the first time before terminating Grainger's employment.

32.     In or about August 2018, Grainger became concerned that one of her female direct reports ("Employee 1") was involved in inappropriate relationships with male Club members, including a sexual relationship with prominent Club member, Member 1.

33.     Employee 1's conduct violated the Club's policies, which prohibit employees from "fraternizing" with Club members.

34.     Ultimately, Employee 1 had to be separated from WCC because of these violations and her performance.

35.     In or about May 2021, Grainger learned that a second female Club employee ("Employee 2") was engaged in a similar relationship with a different prominent Club member. The male member became a virtual fixture around the squash facility when he was not away on business.

36.     Employee 2's performance began to deteriorate as a result.  For instance, she would permit the male member to play squash without billing the time to his account[7]; disappear from work after playing squash with the male member; and spend significantly less time performing work-related tasks, such as administering WCC's ten-and-under program and conducting lessons and clinics.[8]  The relationship caused a significant disruption in Employee 2's performance, focus and attitude.  Grainger conveyed her concerns to Nevin and Board Member 1.

37.     Grainger counseled Employee 2 about these issues, and asked for management assistance from Board Member 1, to no avail.

---

[7]     All time on the court must be billed to a member even if the member is playing with a WCC employee.

[8]     During the latter part of 2021, Employee 2 averaged approximately 24 hours per week conducting lessons and clinics.  A comparable employee at another club averaged more than 40 hours per week on these tasks.

38.     In or about October 2021, Grainger became especially concerned about sexual harassment at the Club when she discovered a trail of text messages among male Club members discussing a "lineup" of women they had apparently picked out for the evening's "fun."  The text exchange, which was sent to Employee 2 by Member 1, included pictures of three provocatively dressed women who appeared to be sex workers.  Grainger protested to Board Member 1.

39.     This was not the first time Grainger became concerned about the way male Club members were treating Employee 2.  In or about August 2020, Employee 2's sister called Grainger in a panic after midnight, stating that she believed Employee 2 had been drugged while out with Member 1.  Grainger rushed over to Employee 2's home to take care of her.

40.     Grainger complained about this incident to Board Member 1.

41.     Grainger subsequently learned that Member 1 paid Employee 2 and, as Member 1 admitted, "not for squash."

42.     Grainger also learned that another female employee ("Employee 3") complained that she was sexually assaulted by another male Club member at one of Member 1's personal residences.

43.     Based on this pattern of conduct, Grainger reasonably believed that the Club was tolerating, if not permitting, the sexual harassment of female employees, particularly by Member 1, who had numerous personal and business dealings with the Club's past and current male leadership.

44.     Ultimately, Grainger raised harassment concerns to HR.

45.     The Club's written policies required that it "fully investigate" Grainger's concerns and protect her as a whistleblower.

46.     Rather than investigate, however, in December 2021, WCC's Head of Security and two of its executives, Carol Miller (Head of Human Resources ("HR")) and Nevin, grilled Grainger and suggested that she should not have raised her concerns to the Club's Racquets Committee Members or Board Members.

## IV.     GRAINGER'S WRITTEN COMPLAINTS

47.     On March 7, 2022, Grainger sent an email protesting, among other things, sexual harassment.

48.     Grainger's email stated that:

- Employee 1 "reputedly had dalliances with one of more members of WCC";

- Employee 2 "also had dalliances with one or several members";

- "[A]t least one member engaged in 'sexting' – along with other members, including one bizarre instance a trail of messages showing pictures of three 'call girls' picked out by one of the members for that evening's 'fun'; and

- Grainger had been called to help Employee 2 who "had been drugged at a bar while out with a male member."

## V.     THE CLUB TERMINATES GRAINGER'S EMPLOYMENT

49.     Nine days later, on March 16, 2022, Christiana and Nevin demanded that Grainger resign.

50.     They claimed that they had "lost faith" in Grainger.  They did not provide specifics, other than to assert—falsely—that Grainger had spent excessive time away from work the past winter.

51.     In fact, as Christiana, Nevin and Board Member 1 were undoubtedly aware, Grainger's job duties often required that she travel with junior members and their families to tournaments around the country, including with Board Member 1's daughters.

52.     Indeed, from roughly the period September 2021 through March 2022, Grainger worked more than 166 days, excluding holidays—more than 84% of all days.  And even when not at the Club, Grainger communicated regularly with junior players, advising them on college placement, including for Board Member 1's children.

53.     Prior to Grainger's complaint of harassment, no one claimed—or even suggested—that she had been absent from work.  Indeed, WCC rewarded Grainger with a merit raise in or about July 2019, and additional management and oversight pickleball responsibilities in 2021, because of her excellent performance.

54.     Grainger resisted the Club's effort to push her out.  She told Christiana and Nevin that she did not intend to resign, that she loved her job and that she had created one of the best squash programs in the country.

55.     On March 22, 2022, WCC again tried to force Grainger to resign, threatening to fire her for "cause" if she refused.  This time, WCC cited additional—but equally false—reasons: that Grainger improperly held a local junior tournament and helped a local school.  But the Club and Board Member 1 knew about, and approved, each of these months earlier.

56.     Grainger protested that the reasons given for her dismissal were obviously false.

57.     Undeterred, Nevin insisted that Grainger resign, threatening that, otherwise, she would face the "embarrassment" of being dismissed.

58.     Nevin's threat to embarrass Grainger if she did not quit was an obvious effort to sanitize the circumstances surrounding Grainger's departure.  Per written policy, the Club does

not announce the reason for an employee's departure.  Rather, WCC reveals information "limited to dates of employment, title of position, and hourly wage or salary."  In other words, Nevin's threat was an effort to muzzle Grainger about her complaints of harassment.

59.     On March 23, 2022, Grainger, facing a serious threat to her career if she did not resign, requested five days to consider her options.  Christiana demanded an answer in only two days.

60.     Once again, Grainger refused to resign, protesting that she was the victim of discrimination and retaliation.  Specifically, on March 25, 2022, Grainger wrote:

> I will not resign from my position.  It is very clear that the allegations WCC has made in support of the claim that "Cause" exists under my employment contract are spurious and entirely contradicted by the actual facts.  I explained why this is so in the discussion last week.
>
> I believe the real reason these "Cause" claims are being raised, and why I'm being pressured to resign on pain of firing, is that I complained about serious issues of sexual harassment at the Club.  I also think that the Club's actions amount to gender discrimination, particularly given the striking dearth of female leaders.

61.     WCC, through Miller, responded that the Club would "investigate" Grainger's claims and "get back" to Grainger "once the investigation is complete."

62.     Upon information and belief, no such investigation occurred in violation of the Club's Whistle Blower Policy.

63.     Rather, on Saturday, March 26, 2022, only a day after Grainger complained about discrimination and retaliation (and just after Grainger finished coaching Club members), Nevin fired Grainger for "cause," claiming that the decision had been made by the Club's Racquets Committee.

64.     This, too, was false.  Numerous Racquets Committee members were unaware of the decision to fire Grainger.

11

65.     A few days later, Grainger learned of another disturbing incident that further supported her belief that WCC created a hostile work environment for women.  The wife of a WCC Board Member admitted to Grainger that Employee 2 had previously alleged to Board Member 1 that she had been raped by Member 1.

66.     After dismissing Grainger in retaliation for protesting discrimination, a WCC executive admitted that the Club had to "put together a dossier" on Grainger, presumably as a threat in the event Grainger sought to exercise her right to bring claims.

67.     The Club also refused to reimburse Grainger for approximately $50,000 in club merchandise to be sold in the WCC squash shop.  The Club was prepared to reimburse Grainger for these expenses, as it had done for her male predecessor Witham.  But the day before the Club was to deliver the check to Grainger, Board Member 1 directed that the Club withhold payment to Grainger.[9]

68.     This, of course, was not the first time the Club treated Grainger differently from her male colleagues.  In early 2020, WCC placed Grainger on a months-long furlough because of the pandemic.  Her male colleagues were not furloughed.

69.     Upon information and belief, Defendants offered Grainger's position to a less-qualified man, who moonlights as a disc jockey.

---

[9]     The customized squash merchandise can only be sold at the Club because most of it is imprinted with the WCC logo.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of NYSHRL)
*Against All Defendants*

70.     Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

71.     The NYSHRL makes it unlawful to discriminate against an employee on the basis of her gender.

72.     By the conduct described above, Defendants discriminated against Plaintiff.

73.     As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of NYSHRL)
*Against All Defendants*

74.     Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

75.     The NYSHRL provides that, "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

76.     By the conduct described above, in response to Plaintiff's protected complaints and/or reports, Defendants retaliated against Plaintiff.

77.     As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be

determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
**(Retaliation in Violation of New York Not-For-Profit Law)**
*Against Defendant WCC*

78.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

79.     New York Not-for-Profit Corporation Law § 715-b provides that every applicable organization have a policy confirming that "no director, officer, employee or volunteer of a corporation who in good faith reports any action or suspected action taken by or within the corporation that is illegal, fraudulent or in violation of any adopted policy of the corporation shall suffer intimidation, harassment, discrimination or other retaliation or, in the case of employees, adverse employment consequence."

80.     WCC either does not have a policy compliant with §715-b or has a written policy that is compliant but does not follow such policy in practice.  Furthermore, WCC and its executives are on notice of and have acquiesced to non-compliance with such policy.

81.     By the conduct described above, in response to Plaintiff's protected complaints and/or reports, WCC retaliated against Plaintiff.

82.     As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

14

## FOURTH CAUSE OF ACTION
### (Breach of Contract)
*Against Defendant WCC*

83.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

84.     Pursuant to Grainger's Employment Agreement, the Club was required to pay Grainger a severance of one month salary and continued medical benefits in the event it terminated Grainger's employment without cause.

85.     The Club breached the Employment Agreement by failing to pay Grainger's severance despite dismissing her without cause and refusing to reimburse her expenses.

## FIFTH CAUSE OF ACTION
### (Discrimination in Violation of Title VII)
*Against All Defendants*

86.     By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her sex in violation of Title VII by denying Plaintiff the same terms and conditions of employment available to male employees, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and terminating her employment.

87.     As a direct and proximate result of the unlawful discriminatory conduct committed by Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

88.     As a direct and proximate result of the unlawful conduct committed by Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety,

loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled

to an award of monetary damages and other relief.

89.     Defendants' unlawful and discriminatory actions were done with willful

negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless

as to amount to such disregard of Plaintiff's protected rights under Title VII, for which Plaintiff is

entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**
*Against All Defendants*

90.     By the actions described above, among others, Defendants retaliated against

Plaintiff for complaining about unequal treatment on the basis of sex, including Defendants

culture of sexual harassment, by altering her working conditions and terminating her

employment.

91.     As a direct and proximate result of the unlawful retaliatory conduct committed by

Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary

and/or other economic harm for which she is entitled to an award of monetary damages and

other relief.

92.     As a direct and proximate result of the unlawful retaliatory conduct committed by

Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe

mental anguish and emotional distress, including, but not limited to, humiliation,

embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain

and suffering for which she is entitled to an award of monetary damages and other relief.

93.     Defendants' unlawful and retaliatory actions were done with willful negligence,

or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to

16

amount to such disregard of Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New York;

B.      An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

E.      An award of compensatory damages;

F.      An award of punitive damages;

G.      Prejudgment interest on all amounts due;

H.      An award of costs that Plaintiff incurs in this action, as well as an award of reasonable attorneys' fees, costs and disbursements to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: September 29, 2023
New York, New York                    Respectfully submitted,

**WIGDOR LLP**

By: _____
         Valdi Licul

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com

*Counsel for Plaintiff*

18