# EXHIBIT B

AO 88B  (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| NATALIE GRAINGER <br><br>*Plaintiff* <br>v. <br> WESTCHESTER COUNTRY CLUB, INC., MARK CHRISTIANA and TOM NEVIN <br><br>*Defendant* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.   7:23-cv-01802 (CS)

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:        PEER T. PEDERSEN, JR., c/o Ethan A. Brecher, Esq.

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Please see Schedule "A" annexed hereto.

| Place: Gordon Rees Scully Mansukhani, LLP <br> One Battery Park Plaza, 28th Floor <br> New York, New York 10004 | Date and Time: <br><br> June 7, 2024 at 10:00 a.m. |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:        05/24/2024

|  *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ John Mills <br> _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Defendants
Westchester Country Club, Inc., Mark Christiana and Tom Nevin        , who issues or requests this subpoena, are:
Gordon Rees Scully Mansukhani, LLP, John T. Mills, Esq., One Battery Park Plaza, 28th Floor, New York, New York, 10004, (212) 453-0778, jtmills@grsm.com

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  7:23-cv-01802 (CS)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE "A"

## DEFINITIONS

1.     The definitions set forth in Local Civil Rule 26.3 are hereby deemed incorporated by reference into these document requests.

2.     "Plaintiff" and/or "Grainger" refer to Plaintiff Natalie Grainger or any agent who has acted or is acting on her behalf.

3.     "WCC" refers to defendant Westchester Country Club, Inc., or any agent who has acted or is acting on its behalf.

4.     "Christiana" refers to defendant Mark Christiana.

5.     "Nevin" refers to defendant Tom Nevin.

6.     "Defendants" refers collectively to WCC, Christiana, and Nevin.

7.     "Complaint" refers to the Amended Complaint in this matter, filed on September 29, 2023, a copy of which is attached hereto as **Exhibit "A."**

8.     Where a pseudonym is used to identify an individual, such pseudonym refers to the same individual to whom you have referred in the Complaint as that pseudonym. As an example, "Board Member 1" refers to the individual called "Board Member 1" in the Complaint.

9.     "Person" means any and all natural persons, firms, corporations, trusts, businesses, or entities, including all members, officers, directors, employees, agents, representatives, attorneys, successors, predecessors, assigns, divisions, affiliates and subsidiaries.

10.     "Relevant Time Period" refers to the time period from May 1, 2018 through the present, unless otherwise specified.

11.     "All documents" means each and every document, as defined by Local Civil Rule 26.3, that can be located, discovered or obtained by reasonable diligent efforts, including without limitation all documents possessed by you or your counsel, and any other person from whom you

can obtain such documents by request or which you have a legal right to bring within your possession by demand, including but not electronically stored information.

12.     "Employment or affiliation" means any relationship, either directly or indirectly, on your own behalf or in the service or on behalf of others, as a consultant, technical, management, supervisory, executive, or other employee of any individual, company, partnership, or business concern or entity, or as an independent contractor for any individual, company partnership, or business concern or entity.

## INSTRUCTIONS

1.     These document requests are to be answered by you to the extent of all information that is or may be available to you or any person (including, but not limited to, employee, agent, expert, accountant, or attorney) who has acted or is now acting on your behalf.

2.     These document requests are continuing in nature.  You must promptly produce all additional responsive information and documents that may become known to you or your attorneys (without further request by Defendants) prior to the trial of this action.  Defendants reserve the right to object at the time of trial to the offering into evidence of any documents or information that has been demanded and not produced.

3.     Each document request shall be answered separately.  Each answer shall first set forth *verbatim* the request to which it is responsive.  Moreover, each document produced in response to a particular request shall be segregated to reflect the specific request to which it is responsive.  If a document is responsive to more than one request, you must specify each request to which it is responsive.  If you object, the objection shall be stated with specificity, and you shall provide all documents to the extent the request is not objectionable.

4.     If any form of privilege is claimed with respect to any request herein, set forth each

and every fact upon which the privilege is based, including sufficient facts for the Court to make a full determination of the validity of the privilege, in accordance with Local Civil Rule 26.2.

5.      If, after reasonable and thorough investigation, using due diligence, you claim any document cannot be produced, in whole or in part, on the grounds that it is not available to you, specify in full and complete detail why it is not available to you, all efforts that have been made to locate it, and identify each individual you believe may possess any information regarding its present location.  In addition, specify what knowledge or belief you do have concerning the existence of documents concerning the unanswered portion of any request and set forth the facts upon which such knowledge or belief is based.

6.      With respect to any responsive document or partial document that at one time was but is no longer in your possession, custody, or control, state:

      a.      The type of document;

      b.      The subject matter and contents of the document;

      c.      The author of the document;

      d.      Each person to whom the original or a copy of the document was sent;

      e.      The date on which the document was prepared or transmitted;

      f.      The date on which the document was lost or destroyed and, if destroyed, the condition of and reasons for such destruction and the persons requesting and performing the destruction.

7.      You shall preserve the integrity and appearance of any webpage, blog, and/or website posting, including those on a social network website, concerning this action and/or your mental or physical state or location throughout this action or throughout the timeframe underlying this action.

8.      In addition to the rules of construction contained in Local Civil Rule 26.3, which are incorporated herein by reference, wherever necessary to ensure completeness or accuracy, to make the request inclusive rather than exclusive, and/or to bring within the scope of the request responses that might otherwise be construed to be outside the scope:

      a.      The masculine shall include the feminine and vice versa;

      b.      The use of a verb in any tense shall be construed as the use of the verb in all other tenses; and

      c.      "Each" shall include "every" and vice versa.

9.      Where a request does not specifically request a document or a portion of a document but where such document or portion is necessary to make the response to said request either comprehensible, complete, or not misleading, you must include such document or portion as part of that response, and the request shall be specifically deemed to request such document or portion.

10.      The documents requested herein include all documents that were at any time in your possession, without regard to whether such documents were originally prepared by you.

11.      In responding to this subpoena, you need not include any documents that you contend are subject to the spousal privilege, nor will Defendants require a privilege log for these documents at this time.  Nonetheless, and notwithstanding the foregoing instruction, Defendants reserve the right to challenge the applicability of the spousal privilege and reserve any and all rights in this regard.

## DOCUMENTS REQUESTED

1.      All documents, communications and/or ESI regarding Plaintiff's employment at WCC.

2.     All documents, communications and/or ESI concerning Plaintiff's attendance during her tenure at WCC.

3.     All documents, communications and/or ESI concerning Plaintiff's performance as Director of Squash for WCC.

4.     All documents, communications and/or ESI concerning Plaintiff's interactions with WCC current or former employees.

5.     All documents, communications and/or ESI concerning your interactions with WCC current or former employees.

6.     All documents, communications and/or ESI concerning Plaintiff's alleged complaints of discrimination and retaliation as alleged in the Complaint.

7.     All documents, communications and/or ESI concerning Plaintiff's claims against Defendants.

8.     All documents, communications and/or ESI concerning Plaintiff's lawsuit against Defendants.

9.     All documents, communications and/or ESI received from any third-party regarding or related to the allegations in the Complaint.

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
NATALIE GRAINGER,                   :

                             :     Case No.: 7:23-cv-01802 (CS)

                Plaintiff,     :

                             :

            v.                :     **AMENDED COMPLAINT**

                             :

WESTCHESTER COUNTRY CLUB, INC.,   :

MARK CHRISTIANA and TOM NEVIN,   :     <u>**Jury Trial Demanded**</u>

                             :

                             :

                Defendants.   :
--------------------------------------------------------X

       Plaintiff Natalie Grainger (Plaintiff or "Grainger"), by and through her attorneys, Wigdor

LLP, as and for her Complaint against Defendant Westchester Country Club ("WCC" or the

"Club"), Mark Christiana ("Christiana") and Tom Nevin ("Nevin") (collectively "Defendants"),

alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

       1.      WCC, an exclusive country club in Westchester, New York, claims to be a

"family oriented" establishment.  In 2018, Grainger, a world-class squash athlete, joined WCC as

its Squash Director.  She was the only female Director at the time and, upon information and

belief, the only female sports Director in the Club's 100-year history.  She was very successful in

her role.

       2.      Over time, however, Grainger became concerned that female Club employees

were being harassed by male Club members.  For example, she learned that two of her junior

reports were involved in sexual relationships with male club members, including Member 1.  In

one instance, Grainger had to intervene because one of these women had, according to the

woman's sister, been drugged while out with a male club member.  In another instance, Grainger

saw that a female employee was included in a "sext" exchange among male club members, including Member 1, discussing a "lineup" of women they had apparently picked out for the evening's "fun."

3.      Grainger complained about the harassment.  She protested repeatedly to the Club's Head of Racquets and a Member of the Club's Board, Board Member 1, identifying the members involved.  She also submitted a written complaint to the Club's Board Chairman, on March 7, 2022.

4.      The Club responded by demanding that Grainger "resign" or else, according to Club Manager Nevin, she would be fired for cause and publicly embarrassed.

5.      Grainger refused, complaining that she was the victim of retaliation.  Defendants fired her the next day.

6.      Grainger brings this action alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.* ("NYSHRL") and the New York Not-for-Profit Corporations Law § 715-b ("Not-for-Profit Law").  She also alleges breach of contract.

## ADMINISTRATIVE PROCEDURES

1.      On January 13, 2023, Grainger filed a Charge of Discrimination (the "Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). The EEOC issued Plaintiff a Notice of Right to Sue on September 22, 2023.[1]

---

[1]      On June 28, 2023, during an Initial Conference, the Court granted Plaintiff leave to amend the Complaint to add claims of discrimination and retaliation under Title VII.

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is a diversity of citizenship among the parties and this action involves an amount in controversy that exceeds $75,000, excluding interests and costs.

8.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred here.  The Club has business operations located in this District and Plaintiff's employment and performance occurred in this District.

## PARTIES

9.      Plaintiff Natalie Grainger is the former Director of Squash at WCC.  Grainger was an employee of WCC.  She is domiciled in Connecticut.

10.     Defendant WCC is a private country club located in Rye, New York.  It is a New York registered not-for-profit corporation.

11.     Defendant Mark Christiana was Board President of WCC.  He is domiciled in New York.

12.     Defendant Tom Nevin was Club Manager of WCC.  He is domiciled in South Carolina.

## FACTS

I.      **BACKGROUND**

13.     WCC promotes itself as "an exclusive family oriented Club" in Westchester that "has been ranked 29th of 4,000 private Clubs in the United States[2] and maintains its status as a

---

[2]      https://www.wccclub.org/about-us.

'Platinum Club.'"[3]   The Club offers its members "world-class facilities, including two Championship Golf Courses, a Beach Club on Long Island Sound and comprehensive Tennis and Squash facilities."[4]   To be admitted, a member has to pay a $170,000 initiation fee and $15,000 in annual fees.

14.     For the last 25 years, Grainger has been one of the top female squash players and coaches in the world.

15.     She is one of the most decorated professional squash players in United States history and is the only player (man or woman) to achieve the #1 world ranking in both singles and doubles squash.

16.     Among her many extraordinary achievements, Grainger is a three-time U.S. Open Champion, 15-time U.S. National Champion, seven-time South African National Champion, three-time Pan American Games gold-medal winner for the United States, and a World Open Champion in Women's Doubles and Mixed Doubles.  Grainger is also a two-time World 35+ and a World 40+ Squash Singles Champion.

17.     Grainger's coaching achievements are equally extraordinary.  She coached the U.S. National Team for 15 years and the U.S. Women's World Championship Team.  In 2011, the U.S. Olympic Committee named her Coach of the Year.  She coached all four of the top ranked U.S. female players currently listed in the World Rankings.

18.     Grainger has earned numerous awards for her leadership in women's sports.  She served for eight years as the President of the Women's International Squash Professional Association, the sport's professional governing body, and in 2016 was awarded the U.S. Squash

---

[3]      "Platinum" status is "the most revered recognition in the private cub industry." https://www.platinumclubsofamerica.com/.
[4]      https://www.wccclub.org/about-us.

Achievement Cup — the sport's most prestigious award given for "Profound Contributions" to squash.  Grainger also received the inaugural "Tournament of Champions Women's Leadership Award" in 2014.

19.     From 2009 to 2020, Grainger also served as a Board Member of Squash Haven, an inner-city enrichment program that helps at-risk youth.

20.     In 2011, after retiring from professional competition, Grainger became the Director of Squash at Chelsea Piers in Connecticut, where she built the program, managing six staff members and nine teaching professionals.  In 2011, when Grainger started, there was no squash program; when she departed in 2017, Chelsea Piers had over 500 squash members.

## II.   WCC HIRES GRAINGER

21.     In 2018, WCC hired Grainger from among approximately 70 candidates as the Club's Director of Squash, replacing the outgoing male Director, Lee Witham ("Witham").[5]

22.     Grainger's overall responsibilities required her to manage all aspects of the Club's Squash Program, including managing all level of instruction, junior programs, tournaments, scheduling, budgeting, and full oversight of the squash facilities and the Retail Squash Shop. Grainger was also responsible for managing a staff of squash professionals.

23.     Grainger's compensation consisted of multiple components.  She earned an annual base salary of $145,000.  She also earned additional compensation from lessons, clinics, camps, tournaments and professional merchandise.

24.     Grainger was incredibly successful in her role.  She created, expanded and improved WCC's squash programs for all ages, including pro-am doubles, club championships

---

[5]     For years, WCC permitted Witham to run his own LED court lighting business from the Club.

for juniors, doubles club championships for adults, parent-child doubles, and a new Rackelton

Championship, which combined competitions in squash, tennis and table tennis into one event

for juniors.

25.     As a result of her connections to top college coaches, Grainger developed a

special mentoring program to assist youth player members in getting accepted to top colleges, as

encouraged by many members including Board Member 1.

26.     Grainger also, with Board urging and approval, created and launched the Club's

groundbreaking Pickleball program on the Club's paddle tennis courts, the first of its kind in the

United States.

27.     Because of the program's resounding success, in 2021, Grainger became Co-

Director of Pickleball, entitling her to 50% of all annual Pickleball revenues moving forward.

28.     In less than two years prior to the pandemic, Grainger expanded the Club's squash

programming by more than 400 percent.

29.     She was rewarded for her achievements both in the form of merit raises and by

the Club increasing her responsibilities.

30.     Tellingly, Grainger was the only female Director of any sport at WCC.[6]

## III.     GRAINGER BECOMES A WHISTLEBLOWER AND COMPLAINS ABOUT SEXUAL HARASSMENT

31.     Grainger was able to achieve these stellar results despite a work environment that

was often hostile to women.  In particular, over time, Grainger came to believe that the Club

created, fostered and enabled a sexually hostile work environment for women.

---

[6]     Relatedly, at the time Grainger was hired and throughout virtually her entire employment, there were no female Board Members. Upon information and belief, WCC installed a female Board Member for the first time before terminating Grainger's employment.

+

32.     In or about August 2018, Grainger became concerned that one of her female direct reports ("Employee 1") was involved in inappropriate relationships with male Club members, including a sexual relationship with prominent Club member, Member 1.

33.     Employee 1's conduct violated the Club's policies, which prohibit employees from "fraternizing" with Club members.

34.     Ultimately, Employee 1 had to be separated from WCC because of these violations and her performance.

35.     In or about May 2021, Grainger learned that a second female Club employee ("Employee 2") was engaged in a similar relationship with a different prominent Club member. The male member became a virtual fixture around the squash facility when he was not away on business.

36.     Employee 2's performance began to deteriorate as a result.  For instance, she would permit the male member to play squash without billing the time to his account[7]; disappear from work after playing squash with the male member; and spend significantly less time performing work-related tasks, such as administering WCC's ten-and-under program and conducting lessons and clinics.[8]  The relationship caused a significant disruption in Employee 2's performance, focus and attitude.  Grainger conveyed her concerns to Nevin and Board Member 1.

37.     Grainger counseled Employee 2 about these issues, and asked for management assistance from Board Member 1, to no avail.

---

[7]     All time on the court must be billed to a member even if the member is playing with a WCC employee.

[8]     During the latter part of 2021, Employee 2 averaged approximately 24 hours per week conducting lessons and clinics.  A comparable employee at another club averaged more than 40 hours per week on these tasks.

38.     In or about October 2021, Grainger became especially concerned about sexual harassment at the Club when she discovered a trail of text messages among male Club members discussing a "lineup" of women they had apparently picked out for the evening's "fun."  The text exchange, which was sent to Employee 2 by Member 1, included pictures of three provocatively dressed women who appeared to be sex workers.  Grainger protested to Board Member 1.

39.     This was not the first time Grainger became concerned about the way male Club members were treating Employee 2.  In or about August 2020, Employee 2's sister called Grainger in a panic after midnight, stating that she believed Employee 2 had been drugged while out with Member 1.  Grainger rushed over to Employee 2's home to take care of her.

40.     Grainger complained about this incident to Board Member 1.

41.     Grainger subsequently learned that Member 1 paid Employee 2 and, as Member 1 admitted, "not for squash."

42.     Grainger also learned that another female employee ("Employee 3") complained that she was sexually assaulted by another male Club member at one of Member 1's personal residences.

43.     Based on this pattern of conduct, Grainger reasonably believed that the Club was tolerating, if not permitting, the sexual harassment of female employees, particularly by Member 1, who had numerous personal and business dealings with the Club's past and current male leadership.

44.     Ultimately, Grainger raised harassment concerns to HR.

45.     The Club's written policies required that it "fully investigate" Grainger's concerns and protect her as a whistleblower.

46.     Rather than investigate, however, in December 2021, WCC's Head of Security and two of its executives, Carol Miller (Head of Human Resources ("HR")) and Nevin, grilled Grainger and suggested that she should not have raised her concerns to the Club's Racquets Committee Members or Board Members.

## IV.     GRAINGER'S WRITTEN COMPLAINTS

47.     On March 7, 2022, Grainger sent an email protesting, among other things, sexual harassment.

48.     Grainger's email stated that:

- Employee 1 "reputedly had dalliances with one of more members of WCC";

- Employee 2 "also had dalliances with one or several members";

- "[A]t least one member engaged in 'sexting' – along with other members, including one bizarre instance a trail of messages showing pictures of three 'call girls' picked out by one of the members for that evening's 'fun'; and

- Grainger had been called to help Employee 2 who "had been drugged at a bar while out with a male member."

## V.     THE CLUB TERMINATES GRAINGER'S EMPLOYMENT

49.     Nine days later, on March 16, 2022, Christiana and Nevin demanded that Grainger resign.

50.     They claimed that they had "lost faith" in Grainger.  They did not provide specifics, other than to assert—falsely—that Grainger had spent excessive time away from work the past winter.

51.     In fact, as Christiana, Nevin and Board Member 1 were undoubtedly aware, Grainger's job duties often required that she travel with junior members and their families to tournaments around the country, including with Board Member 1's daughters.

52.     Indeed, from roughly the period September 2021 through March 2022, Grainger worked more than 166 days, excluding holidays—more than 84% of all days.  And even when not at the Club, Grainger communicated regularly with junior players, advising them on college placement, including for Board Member 1's children.

53.     Prior to Grainger's complaint of harassment, no one claimed—or even suggested—that she had been absent from work.  Indeed, WCC rewarded Grainger with a merit raise in or about July 2019, and additional management and oversight pickleball responsibilities in 2021, because of her excellent performance.

54.     Grainger resisted the Club's effort to push her out.  She told Christiana and Nevin that she did not intend to resign, that she loved her job and that she had created one of the best squash programs in the country.

55.     On March 22, 2022, WCC again tried to force Grainger to resign, threatening to fire her for "cause" if she refused.  This time, WCC cited additional—but equally false—reasons: that Grainger improperly held a local junior tournament and helped a local school.  But the Club and Board Member 1 knew about, and approved, each of these months earlier.

56.     Grainger protested that the reasons given for her dismissal were obviously false.

57.     Undeterred, Nevin insisted that Grainger resign, threatening that, otherwise, she would face the "embarrassment" of being dismissed.

58.     Nevin's threat to embarrass Grainger if she did not quit was an obvious effort to sanitize the circumstances surrounding Grainger's departure.  Per written policy, the Club does

not announce the reason for an employee's departure. Rather, WCC reveals information "limited to dates of employment, title of position, and hourly wage or salary." In other words, Nevin's threat was an effort to muzzle Grainger about her complaints of harassment.

59.     On March 23, 2022, Grainger, facing a serious threat to her career if she did not resign, requested five days to consider her options. Christiana demanded an answer in only two days.

60.     Once again, Grainger refused to resign, protesting that she was the victim of discrimination and retaliation. Specifically, on March 25, 2022, Grainger wrote:

> I will not resign from my position. It is very clear that the allegations WCC has made in support of the claim that "Cause" exists under my employment contract are spurious and entirely contradicted by the actual facts. I explained why this is so in the discussion last week.
>
> I believe the real reason these "Cause" claims are being raised, and why I'm being pressured to resign on pain of firing, is that I complained about serious issues of sexual harassment at the Club. I also think that the Club's actions amount to gender discrimination, particularly given the striking dearth of female leaders.

61.     WCC, through Miller, responded that the Club would "investigate" Grainger's claims and "get back" to Grainger "once the investigation is complete."

62.     Upon information and belief, no such investigation occurred in violation of the Club's Whistle Blower Policy.

63.     Rather, on Saturday, March 26, 2022, only a day after Grainger complained about discrimination and retaliation (and just after Grainger finished coaching Club members), Nevin fired Grainger for "cause," claiming that the decision had been made by the Club's Racquets Committee.

64.     This, too, was false. Numerous Racquets Committee members were unaware of the decision to fire Grainger.

65.     A few days later, Grainger learned of another disturbing incident that further
supported her belief that WCC created a hostile work environment for women.  The wife of a
WCC Board Member admitted to Grainger that Employee 2 had previously alleged to Board
Member 1 that she had been raped by Member 1.

66.     After dismissing Grainger in retaliation for protesting discrimination, a WCC
executive admitted that the Club had to "put together a dossier" on Grainger, presumably as a
threat in the event Grainger sought to exercise her right to bring claims.

67.     The Club also refused to reimburse Grainger for approximately $50,000 in club
merchandise to be sold in the WCC squash shop.  The Club was prepared to reimburse Grainger
for these expenses, as it had done for her male predecessor Witham.  But the day before the Club
was to deliver the check to Grainger, Board Member 1 directed that the Club withhold payment
to Grainger.[9]

68.     This, of course, was not the first time the Club treated Grainger differently from
her male colleagues.  In early 2020, WCC placed Grainger on a months-long furlough because of
the pandemic.  Her male colleagues were not furloughed.

69.     Upon information and belief, Defendants offered Grainger's position to a less-
qualified man, who moonlights as a disc jockey.

---

[9]      The customized squash merchandise can only be sold at the Club because most of it is
imprinted with the WCC logo.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of NYSHRL)
*Against All Defendants*

70.     Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

71.     The NYSHRL makes it unlawful to discriminate against an employee on the basis of her gender.

72.     By the conduct described above, Defendants discriminated against Plaintiff.

73.     As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of NYSHRL)
*Against All Defendants*

74.     Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

75.     The NYSHRL provides that, "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

76.     By the conduct described above, in response to Plaintiff's protected complaints and/or reports, Defendants retaliated against Plaintiff.

77.     As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be

determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

### THIRD CAUSE OF ACTION
#### (Retaliation in Violation of New York Not-For-Profit Law)
#### *Against Defendant WCC*

78.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

79.     New York Not-for-Profit Corporation Law § 715-b provides that every applicable organization have a policy confirming that "no director, officer, employee or volunteer of a corporation who in good faith reports any action or suspected action taken by or within the corporation that is illegal, fraudulent or in violation of any adopted policy of the corporation shall suffer intimidation, harassment, discrimination or other retaliation or, in the case of employees, adverse employment consequence."

80.     WCC either does not have a policy compliant with §715-b or has a written policy that is compliant but does not follow such policy in practice.  Furthermore, WCC and its executives are on notice of and have acquiesced to non-compliance with such policy.

81.     By the conduct described above, in response to Plaintiff's protected complaints and/or reports, WCC retaliated against Plaintiff.

82.     As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### (Breach of Contract)
### *Against Defendant WCC*

83.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

84.     Pursuant to Grainger's Employment Agreement, the Club was required to pay Grainger a severance of one month salary and continued medical benefits in the event it terminated Grainger's employment without cause.

85.     The Club breached the Employment Agreement by failing to pay Grainger's severance despite dismissing her without cause and refusing to reimburse her expenses.

## FIFTH CAUSE OF ACTION
### (Discrimination in Violation of Title VII)
### *Against All Defendants*

86.     By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her sex in violation of Title VII by denying Plaintiff the same terms and conditions of employment available to male employees, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and terminating her employment.

87.     As a direct and proximate result of the unlawful discriminatory conduct committed by Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

88.     As a direct and proximate result of the unlawful conduct committed by Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety,

loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

89.     Defendants' unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**
***Against All Defendants***

90.     By the actions described above, among others, Defendants retaliated against Plaintiff for complaining about unequal treatment on the basis of sex, including Defendants culture of sexual harassment, by altering her working conditions and terminating her employment.

91.     As a direct and proximate result of the unlawful retaliatory conduct committed by Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

92.     As a direct and proximate result of the unlawful retaliatory conduct committed by Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

93.     Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to

amount to such disregard of Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.  A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New York;

B.  An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.  An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D.  An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

E.  An award of compensatory damages;

F.  An award of punitive damages;

G.  Prejudgment interest on all amounts due;

H.  An award of costs that Plaintiff incurs in this action, as well as an award of reasonable attorneys' fees, costs and disbursements to the fullest extent permitted by law; and

I.  Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: September 29, 2023
      New York, New York              Respectfully submitted,

                                        **WIGDOR LLP**

                                        By: _____
                                              Valdi Licul

                                        85 Fifth Avenue
                                        New York, NY 10003
                                        Telephone: (212) 257-6800
                                        Facsimile: (212) 257-6845
                                        vlicul@wigdorlaw.com

                                        *Counsel for Plaintiff*